JOSEPH H. HUNT
Assistant Attorney General
ROBERT S. BREWER, JR.
United States Attorney
ALEXANDER K. HAAS
Director, Federal Programs Branch
JACQUELINE COLEMAN SNEAD
Assistant Director, Federal Programs Branch
STEPHEN EHRLICH
Trial Attorney (N.Y. Bar No. 5264171)
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Tel.: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

*Attorneys for the United States*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GAVIN NEWSOM, in his Official Capacity as Governor of California; XAVIER BECERRA, in his Official Capacity as Attorney General of California; THE STATE OF CALIFORNIA,<br><br>Defendants. | Civil Action No. **'20CV0154 MMA AHG**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1. California recently passed Assembly Bill 32 (A.B. 32), which bans the operation of private detention facilities in California after January 1, 2020. California, of course, is free to decide that it will no longer use private detention facilities for its state prisoners and detainees. But it cannot dictate that choice for the Federal Government, especially in a manner that discriminates against the Federal Government and those with whom it contracts.

2. The Constitution, numerous acts of Congress, and various implementing regulations give the Federal Government both the authority and the prerogative to house individuals in its custody, including in private detention facilities. Exercising that authority, the Federal Government has long contracted with private detention facilities to house federal prisoners and detainees, and it plans to continue that practice in order to address serious needs for detention space in California and elsewhere. The Federal Government must be allowed to make these policy choices without interference from the several States.

3. In this action, the United States seeks a declaration invalidating, and order enjoining, enforcement of A.B. 32 against the Federal Government and those with whom it contracts for private detention facilities. This statute is preempted by federal law, impermissibly discriminates against the Federal Government, and obstructs federal operations. It therefore violates the Supremacy Clause of the Constitution.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 2201(a), 1331, 1345.

5. Venue is proper in the Southern District of California under 28 U.S.C. § 1391(b) because Defendants reside within the District and a substantial part of the acts or omissions giving rise to this action arose from events occurring within this district.

**PARTIES**

6. Plaintiff, the United States, enforces federal criminal laws under its constitutional and statutory authorities and through its Executive Branch agencies, including the Department of Justice (DOJ) and its sub-agencies, the Bureau of Prisons (BOP) and the U.S. Marshals Service (USMS). The Federal Government also regulates immigration under its constitutional and statutory authorities, and it enforces the immigration laws through its Executive Branch agencies, including the Departments of Justice, State, Labor, and Homeland Security (DHS) including DHS's component agencies, U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP).

7. Defendant Gavin Newsom is the Governor of the State of California and is being sued in his official capacity.

8. Defendant Xavier Becerra is the Attorney General for the State of California and is being sued in his official capacity.

9. Defendant State of California is a State of the United States.

**FEDERAL AUTHORITY**

10. The Supremacy Clause of the Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

11. The Constitution affords Congress the power to spend money for the "general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1; to "regulate Commerce with foreign Nations, and among the several States," U.S. Const. art. I, § 8, cl. 3; to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4; and to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," U.S. Const. art. IV, § 3, cl. 2.

12. The Constitution also affords the President of the United States the authority to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

13. Based on its constitutional powers, Congress has passed numerous statutes, and the Executive Branch has promulgated numerous implementing regulations, governing the Federal Government's custody of prisoners and other federal detainees.

**I.   Federal Prisoners**

14. By delegation from Congress, the Attorney General—who oversees BOP and USMS—is ultimately responsible for the control and management of federal penal and correctional institutions. 18 U.S.C. § 4001. Expenses for federal confinement are paid out of the U.S. Treasury. 18 U.S.C. §§ 4007–09.

15. BOP has the authority and responsibility to "designate the place of . . . imprisonment" for persons sentenced to imprisonment. 18 U.S.C. §§ 3621, 4042. And BOP "may designate" as a place of confinement "any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau [of Prisons], whether maintained by the Federal Government or otherwise." 18 U.S.C. § 3621(b). This plain language "gives BOP open-ended authority to place federal prisoners in 'any available penal or correctional facility' that meets minimum standards of health and habitability without regard to what entity operates the prison." Statutory Authority to Contract with the Private Sector for Secure Facilities, 16 Op. O.L.C. 65, 67 (1992); *see* 18 U.S.C. §§ 4002, 4003; 28 C.F.R. § 500.1.

16. Similarly, "in support of United States prisoners in non-Federal institutions," the Attorney General is authorized to fund USMS custody of individuals "under agreements with State or local units of government or contracts with private entities." 18 U.S.C. § 4013(a). USMS therefore may "designate districts

that need additional support from private detention entities." 18 U.S.C. § 4013(c); 28 C.F.R. §0.111(k); 28 C.F.R. §0.111(o).

17. Congress also expressly has provided that a federal prisoner may serve a limited portion of his or her sentence "under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community," including in a community correctional facility. 18 U.S.C. § 3624(c); *see* 18 U.S.C. § 3563(b)(10)–(11).

18. A pervasive framework of statutes and regulations also contemplates housing individuals in federal custody outside of federally owned-and-operated prisons and governs all aspects of federal confinement, including the transportation and subsistence of prisoners. *See, e.g.*, 18 U.S.C. §§ 3142, 3624, 4006, 4008, 4241–47, 4248, 4081, 5039; 28 C.F.R. §§ 0.111a, 523.13, 550.40 *et seq.*

## II. Federal Immigration Detainees

19. The United States also has full authority to house federal detainees when exercising its constitutional power as a sovereign to control and conduct relations with foreign nations. Congress has exercised its authority to make laws governing the admission, entry, presence, status, and removal of aliens within the United States by enacting various provisions of the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, and other laws regulating immigration.

20. In furtherance of its constitutional powers, Congress has codified the Executive Branch's broad authority to detain aliens under various circumstances. *See, e.g.*, 8 U.S.C. §§ 1187, 1222, 1225, 1226, 1226a, 1231. And the Executive Branch has implemented that authority. *See, e.g.*, 6 C.F.R. §§ 115.5 *et seq.*; 8 C.F.R. §§ 103.6, 212.5, 212.12, 212.14, 232.3, 235.3, 236.1, 236.2, 236.3, 241.3, 1241.3, 244.18, 253.2.

21. DHS is congressionally authorized to provide appropriate detention facilities for detainees, including by renting "facilities adapted or suitably located for detention" and by entering cooperative agreements with States and localities. 8

U.S.C. §§ 1103(a)(11), 1231(g). DHS also may "acquire, build, remodel, repair, and operate facilities . . . necessary for detention," but must first "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use." *Id.* § 1231(g)(1).

## ASSEMBLY BILL 32

22. A.B. 32 prohibits anyone from "operat[ing] a private detention facility within [California]" under a contract made or extended after January 1, 2020, even if extensions are authorized by the contract. Cal. Penal Code §§ 9501, 9505(a). A "detention facility" is defined as "any facility in which persons are incarcerated or otherwise involuntarily confined for purposes of execution of a punitive sentence imposed by a court or detention pending a trial, hearing, or other judicial or administrative proceeding." Cal. Penal Code § 9500(a). And a "private detention facility" is defined as a "detention facility that is operated by a private, nongovernmental, for-profit entity, and operating pursuant to a contract or agreement with a governmental entity." Cal. Penal Code § 9500(b).

23. In addition, A.B. 32 prohibits the California Department of Corrections and Rehabilitation from entering into a new contract, or renewing an existing contract, with a "private, for-profit prison facility located in or outside [California] to provide housing for state prison inmates" after January 1, 2020. Cal. Penal Code § 5003.1(a). Notwithstanding this provision, California has granted itself an exception "to comply with the requirements of any court-ordered population cap." Cal. Penal Code § 5003.1(e).

24. A.B. 32 also enumerates limited exceptions to its blanket prohibition on private detention facilities. Five exceptions apply only to California's contracts and are facially inapplicable to the Federal Government's contracts: facilities "providing rehabilitative, counseling, treatment, mental health, educational, or medical services to a juvenile that is under the jurisdiction of the juvenile court pursuant to [California

Complaint | 5

law]"; facilities "providing evaluation or treatment services to a person who has been detained, or is subject to an order of commitment by a court, pursuant to [California law]"; "residential care facilit[ies] licensed pursuant to [California law]"; facilities "used for the quarantine or isolation of persons for public health reasons pursuant to [California law]"; and facilities "used for the temporary detention of a person detained or arrested by a merchant, private security guard, or other private person pursuant to [California law]." Cal. Penal Code § 9502(a)–(b), (d), (f)–(g).

25. Only three exceptions potentially apply to contracts of both the Federal Government and California: facilities "providing educational, vocational, medical, or other ancillary services to an inmate in the custody of, and under the direct supervision of, the Department of Corrections and Rehabilitation or a county sheriff or other law enforcement agency"; school facilities "used for the disciplinary detention of a pupil"; and "any privately owned property or facility that is leased and operated by the Department of Corrections and Rehabilitation or a county sheriff or other law enforcement agency." Cal. Penal Code § 9502(c), (e); § 9503.

26. A.B. 32's ban on contracting with private detention facilities purposefully extends to the Federal Government.

## EFFECT OF A.B. 32 ON FEDERAL OPERATIONS

27. A.B. 32 has both the purpose and effect of hampering the Federal Government's ability to house individuals in its custody.

**I. U.S. Marshals Service**

28. Nationwide, USMS houses over 21,000 of its about 62,000 inmates (almost 34%) in private detention facilities. In California, USMS houses about 1,100 of its 5,000 inmates (approximately 22%) in private detention facilities. All of the private detention facilities contracted by USMS in California are located in the Southern District of California, housing about 1,100 of the almost 2,900 USMS

inmates in that district. About another 450 inmates are housed outside the State due to the unavailability of detention space in California.

29. USMS currently houses inmates in California under two contracts with privately owned and privately operated detention facilities—Western Region Detention Facility and Otay Mesa Detention Center (under an ICE contract)—and one contract with a federally owned and privately operated detention facility—El Centro Service Processing Center. USMS currently houses about 1,100 inmates in the Western Region and Otay Mesa facilities, with the recently awarded El Centro contract allowing USMS to house over 1,800 inmates in the coming year. This accounts for almost 50% of USMS's inmates in the Southern District of California and nearly 30% of USMS's inmates in California.

30. The current option period for the Western Region contract will expire in September 2021, with the contract expiring in September 2027 if all options are exercised. The base periods for the El Centro and Otay Mesa contracts will expire in December 2021 and December 2024, with the contracts expiring in September 2028 and December 2034, respectively, if all options are exercised. USMS only pursues private detention facilities when no other available space exists, so all option years are typically exercised.

31. Based upon current prosecutorial trends, the detention population in California is projected to increase by approximately 25% by Fiscal Year 2023. USMS is currently maximizing all available facilities in California, as well as surrounding districts in other States, in order to meet the overwhelming need for detention space in California.

32. A.B. 32 would cripple USMS operations in California, especially in the Southern District of California. USMS would need to relocate nearly 50% of its inmates in the Southern District of California and nearly 30% of its California

inmates when its contracts expire. These relocations pose significant harm to the USMS' prisoner-management mission.

33. Because USMS has maximized all available space in nearby BOP facilities, and is unable to obtain space in state and local facilities in California, its prisoners would likely be housed outside California. Such relocations would cost significant taxpayer dollars, and require USMS to compete for extremely limited detention space with other agencies, including ICE, due to A.B. 32.

34. This relocation would cause a ripple effect into other districts neighboring California, as detention space would be shared to accommodate displaced California inmates. And those detention facilities could potentially experience overcrowding due to USMS' need to house prisoners in proximity to California's districts.

35. Relocation would also cause prisoners to be isolated from their families, who are usually located in California and may lack resources to visit the prisoner.

36. As USMS's prisoner population is generally pretrial, prisoners (some with very serious charges) must be frequently transported back and forth to California to meet the demands of the Judiciary, defense attorneys, and any pretrial or probationary requirements. This increase in transportation not only would require a dramatic increase in coordination with the Justice Prisoner and Alien Transportation System,[1] as well as state and local transportation resources, but would significantly increase USMS's cost per inmate.

37. The drastic increase in transportation for inmates would also heighten security and safety risks for inmates, USMS personnel, and the public. Frequent, scheduled, movements of prisoners increase the amount of time prisoners are

---

[1] Managed by USMS, the Justice Prisoner and Alien Transportation System is one of the largest transporters of prisoners in the world, handling about 715 requests every day to move prisoners between judicial districts, correctional institutions, and foreign countries.

outside the heightened security of a detention facility. Such transportation also allows the public additional opportunities to gather intelligence on USMS operations and significantly increases adversarial opportunities during transport. And prisoners with medical or mobility concerns may be adversely affected by frequent travel.

38. USMS will also be competing for transportation with, for example, BOP, who would otherwise be using these transportation resources to transport sentenced prisoners to their designated BOP facility. This may delay prisoners from exiting USMS custody, concomitantly increase the number of prisoners in USMS custody and further increase USMS's housing, medical, and funding needs.

39. Due to relocation and transportation from outside the State, A.B. 32 would also cause lengthy delays in judicial proceedings. Housing prisoners outside of their judicial district significantly decreases the ability of courts to properly interact with prisoners as they move through judicial proceedings. USMS estimates that transportation coordination would require approximately three to four weeks advance notice in order to move prisoners in and out of the judicial districts in California.

## II.  Bureau of Prisons

40. Nationwide, BOP houses almost 25,000 of its over 175,000 inmates (approximately 14%) in private detention facilities. In California, BOP houses about 2,200 of its about 16,00 inmates (approximately 14%) in private detention facilities.

41. BOP currently owns one detention facility in California that is privately operated—Taft CI—the contract for which will expire in March 2020. Although BOP considered not renewing the contract due to infrastructure issues at the facility, it is currently conducting a feasibility study to determine if the institution could remain operational while repairs are made. If the facility can remain operational, then BOP may seek to award a new contract or a contract extension.

42. As applied to Taft CI, A.B. 32 will require the relocation of over 1,300 inmates to other BOP facilities or placement outside California. This relocation would cost significant taxpayer dollars. It would also result in the incarceration of inmates further from their residence, families, and other visitors.

43. Although BOP does not have current plans to contract for the operation of other secure private facilities in California, it is evaluating its needs and may pursue contracting for such facilities in the future.

44. BOP also has contracts with four contractors for the operation of ten Residential Reentry Centers throughout the State, housing and supervising about 900 inmates. They are located as follows: one in Riverside, one in Oakland, one in San Francisco, one in San Diego, one in Garden Grove, one in El Monte, one in Brawley, one in Van Nuys, and two in Los Angeles. These Residential Reentry Centers provide assistance to inmates who are nearing release by providing a safe, structured, supervised environment, as well as employment counseling, job placement, financial management assistance, and other programs and services. They also supervise inmates on home confinement.

45. The current periods for these contracts will expire in: September 2020 for the Riverside facility; February 2021 for the Oakland facility[2]; March 2020 for the San Francisco facility; May 2020 for the San Diego facility; August 2020 for the Garden Grove facility; September 2020 for the El Monte facility; September 2020 for the Brawley facility; September 2020 for the Van Nuys facility; and September 2020 and November 2020 for the Los Angeles facilities. If all options were exercised, the contracts would expire in: September 2029 for the Riverside facility; January 2030 for the Oakland facility; March 2021 for the San Francisco facility; May

---

[2] Although BOP's current contract with the Oakland Reentry Center expires in January 2020, BOP executed a new contract for this facility in December 2019. The new contract has a base period of operation from February 2020 through February 2021, with the contract expiring in January 2030 if all options are exercised.

2021 for the San Diego facility; August 2024 for the Garden Grove facility; September 2029 for the El Monte facility; September 2029 for the Brawley facility; September 2029 for the Van Nuys facility; and November 2023 and September 2029 for the Los Angeles facilities.  Given BOP's need for Residential Reentry Centers, all option years are typically exercised.

46. BOP currently has one open solicitation and one potential solicitation it would like to open for Reentry Centers in California: one in the San Francisco area (open) and one in the San Diego area (potential solicitation in an area of need). Additionally, one solicitation for a Reentry Center in the Eastern District of California recently closed in October 2019.  Absent A.B. 32, these solicitations have anticipated performance dates in 2021.

47. The First Step Act of 2018 also expanded BOP's use of Reentry Centers by authorizing extended placement in Reentry Centers for inmates who have earned time credits under the risk-and-needs-assessment system.  *See* 18 U.S.C. §§ 3621, 3624(g).  BOP therefore anticipates a significant increase in the need for California Reentry Centers within the next few years.

48. BOP also maintains capacity in Reentry Centers for use by federal courts as an intermediate sanction during supervision or probation.  This function utilizes generally 15–20% of the total Reentry Center capacity nationally.  Although individuals housed under this arrangement are not in BOP custody, BOP maintains available beds to meet the courts' needs.

49. As applied to California Reentry Centers, A.B. 32 will require the relocation of approximately 900 inmates to other BOP facilities or Reentry Centers outside California.  This relocation would cost significant taxpayer dollars.  It would also result in the placement of inmates further from their residence, families, and the communities to which they will be released.

50. This would hinder BOP's ability to provide community placement for offenders. Specifically, Residential Reentry Centers provide reentry services to inmates by assisting them in obtaining a suitable residence in the community to which they will be released, structured programs, job placement, and counseling. If BOP is forced to relocate inmates to other BOP facilities or Residential Reentry Centers outside California, the inmates will be unable to make the community ties needed in order to support their reentry efforts.

51. This relocation would also be problematic for federal courts because there will be no proximate facilities in which to house individuals as an intermediate sanction during supervision or probation.

### III.   Immigration and Customs Enforcement

52. ICE neither constructs nor operates its own detention facilities. Due to significant fluctuation in the alien population, it is important for ICE to maintain flexibility; it would not be prudent for ICE to invest heavily in its own facilities only to have them stand idle if a significant decrease in demand for detainee housing occurs.

53. Nationwide, ICE housed an average population of about 50,000 aliens in Fiscal Year 2019. An average of about 9,300 of those aliens were housed in privately owned and privately operated facilities, and an average of about 3,800 detainees were housed in facilities owned by ICE and staffed by a combination of federal and contract employees. In California, ICE currently has housing available for about 5,000 detainees in private detention facilities, which accounts for about 96% of ICE's total detention space in California.

54. ICE currently houses detainees in California under four contracts with the operators of four private detention facilities: Mesa Verde ICE Processing Center (owned and operated by the GEO Group, Inc.), Adelanto ICE Processing Center (owned and operated by The GEO Group, Inc.), Imperial Regional Detention

Facility (owned and operated by the Management and Training Corporation), and Otay Mesa Detention Center (owned and operated by CoreCivic). Two of those contracts provide for ICE to house detainees at three additional private detention facilities operated by The GEO Group. The four facilities currently have capacity to house about 5,000 detainees, and the three additional facilities will provide space for an additional 2,150 detainees beginning in August 2020.

55. The base periods for all four contracts will expire in December 2024, with the contracts expiring in December 2034 if all options are exercised.

56. A.B. 32 would critically undermine ICE's mission to enforce the immigration laws, and in particular, to effectuate the arrests and removals of criminal aliens subject to mandatory custody.

57. Because ICE has no access (or very limited access) to housing capacity in California prisons, detainees—both current detainees at the time of contract expiration and future detainees—would need to be relocated outside California to neighboring States. In Fiscal Year 2019, ICE arrested and detained over 44,000 aliens in California. All such detainees would ultimately need to be relocated to neighboring States.

58. Such relocation would require ICE to schedule and complete transfers on a daily basis, using costly air and ground transportation. Ground transportation would be problematic because ICE would be forced to renegotiate its transportation contracts and/or divert a large percentage of ICE personnel to transportation duties. Air transportation would also be problematic because daily transport to and from California would place an enormous strain on ICE Air Operations (IAO) and require significantly more frequent transport than currently used. Both options are extremely costly and burdensome.

59. Frequent movements of detainees increase the amount of time detainees are outside the heightened security of a detention facility. Such transportation also

allows the public additional opportunities to gather intelligence on ICE operations and significantly increases adversarial opportunities during transport.

60. Relocation to neighboring States would also cause substantial harm to ICE, its detainees, and the public. ICE facilities in neighboring States could become overcrowded due to the influx of detainees from California. And the relocation outside California would also greatly reduce the ability of detainees with families in California to access their families and other visitors.

61. This out-of-state relocation and lack of family access for detainees with families in California would also slow immigration proceedings. Generally, an alien often uses his or her family members or friends to gather information needed in a removal proceeding. Because A.B. 32 would force aliens to be housed outside California—and possibly at great distances from their families and friends—A.B. 32 may adversely impact detainees' ability to timely collect evidence if they have family or friends in California.[3]

## COUNT ONE

### Preemption

62. The United States realleges and incorporates by reference the allegations contained in paragraphs 1 through 61 of this Complaint.

63. The United States has occupied the field of contracting for federal prisoner and detainee housing, leaving no room for concurrent state regulation.

64. A.B. 32 also substantially obstructs the Federal Government's housing of federal prisoners and detainees, and stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

---

[3] A.B. 32 may also cause tension with ICE's other obligations under existing court orders and settlements. *See, e.g.*, *Gonzalez v. Sessions*, 325 F.R.D. 616 (N.D. Cal. Jun. 5, 2018); *Franco-Gonzalez v. Holder*, 2013 WL 8115423 (C.D. Cal. 2013); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488 (C.D. Cal. 1988).

65. A.B. 32 therefore violates the Supremacy Clause because it is preempted by federal law. *See* U.S. Const. art. VI.

## COUNT TWO

## Violation of Intergovernmental Immunity

66. The United States realleges and incorporates by reference the allegations contained in paragraphs 1 through 65 of this Complaint.

67. A.B. 32 directly regulates federal operations by restricting the United States' ability to enter agreements with its chosen contractors for the operation of detention facilities.

68. A.B. 32 also discriminates against the United States by granting exceptions for California (and its localities) that do not apply to the Federal Government and those with whom it contracts for private detention facilities.

69. A.B. 32 therefore violates the Federal Government's intergovernmental immunity. *See* U.S. Const. art. VI.

## PRAYER FOR RELIEF

The United States respectfully requests that this Court:

70. Enter a judgment declaring that California's A.B. 32 violates the Supremacy Clause and is therefore invalid as applied to the Federal Government's contracts and its contractors;

71. Preliminarily and permanently enjoin Defendants, as well as their successors, agents, and employees, from enforcing California's A.B. 32 against the Federal Government and its contractors;

72. Award the United States its costs in this action; and

73. Award any other relief this Court deems just and proper.

DATED: January 24, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ROBERT S. BREWER, JR.
United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Director, Federal Programs Branch

*/s/ Stephen Ehrlich*
STEPHEN EHRLICH
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel.:  (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

*Attorneys for the United States*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America

**DEFENDANTS**
Governor Gavin Newsom, in his official capacity; Attorney General Xavier Beccerra, in his official capacity; State of California

**(b)** County of Residence of First Listed Plaintiff  
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Sacramento County, CA  
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*  
Stephen Ehrlich, U.S. Department of Justice, Civil Division  
1100 L St. NW, Washington, DC 20005    (202) 305-9803

Attorneys *(If Known)*

'20CV0154 MMA AHG

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine / ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice / ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 443 Housing/Accommodations / ☐ 530 General | | | [X] 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - Other / **Other:** ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education / ☐ 550 Civil Rights | | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:  
28 U.S.C. §§ 1651, 2201, 2202  
Brief description of cause:  
Declaratory and injunctive action seeking to invalidate California's law banning private detention facilities (A.B. 32)

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.  
**DEMAND $**  
CHECK YES only if demanded in complaint:  
**JURY DEMAND:** ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*  
JUDGE  Janis L. Sammartino  
DOCKET NUMBER  3:19-cv-02491

DATE  01/24/2020  
SIGNATURE OF ATTORNEY OF RECORD  /s/ Stephen Ehrlich

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE